| | | |
|---|---|---|
| N.L., by his parents and next friends JAMES LORDO and JACKIE LORDO, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 4:08-CV-1804 (CEJ) |
| SPECIAL SCHOOL DISTRICT OF ST. LOUIS COUNTY, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the parties' cross motions for judgment on the administrative record. The parties have each responded to the motions and the issues are fully briefed.

### I. Background

Plaintiffs James and Jackie Lordo, the parents of student N.L., seek judicial review of the decision of a three-member due process panel hearing held pursuant to 20 U.S.C. § 1415 and Missouri Revised Statutes § 162.961. Plaintiffs allege that defendant Special School District of St. Louis County (SSD) failed to provide N.L. with a free and appropriate public education (FAPE) in the least restrictive environment, as required under the Individuals with Disabilities Education Act (IDEA). The hearing panel agreed that N.L. was denied a free and appropriate education in the least restrictive environment for a period of time beginning around November 2006, but denied plaintiffs' request for reimbursement for tuition expenses incurred by plaintiffs when they placed N.L. in private school. Plaintiffs request that the Court reverse the panel's decision in that regard and award tuition reimbursement to plaintiffs. Plaintiffs

also ask the Court to remand this matter to the hearing panel for a determination of the appropriate special education placement for N.L.

Defendant SSD filed a counterclaim seeking reversal of the hearing panel's finding that SSD failed to provide N.L. a free and appropriate education in the least restrictive environment. SSD also claims that the panel's refusal to provide tuition reimbursement was appropriate and that the panel was not required to order a future placement for N.L.

## II. Evidence Presented to the Hearing Panel

### A. Pre-Kindergarten

N.L. was born on February 15, 1999 in Romania. He was adopted by plaintiffs in November 1999, when he was nine months old. N.L. exhibited aggressive behavior at an early age and was expelled from multiple preschools, beginning when he was as young as sixteen months.

N.L. was referred for an Early Childhood Special Education Evaluation on October 23, 2001 and that evaluation was completed on January 14, 2002. N.L.'s initial diagnosis was Young Child with a Developmental Delay, with delays in communication, social and emotional behavior, and physical development. An Individualized Educational Program ("IEP"), developed on February 8, 2002, found N.L. eligible for Early Childhood Special Education Services. In April 2002, the IEP team determined that N.L. was also eligible for Extended School Year services during the summer months, but plaintiffs declined these services.

During the 2002-2003 school year, N.L. was enrolled in Rockwood School District's Early Childhood Special Education Program. N.L.'s teacher at the time, Leslei Harper, opined that N.L.'s behavior could support the conditions of ADHD or Reactive

Attachment Disorder.[1]  Ms. Harper noted that N.L. had difficulty complying with requests, had an insatiable demand for attention, and was unable to understand the difference between pretend and real.  Ms. Harper also reported that N.L. was aggressive and hurt other children without remorse.  Ms. Harper suggested that N.L. undergo a psychiatric evaluation.

A  progress note dated December 19, 2002, indicated that N.L. made threats and was physically aggressive towards teachers and classmates.  On January 7, 2003, it was reported that N.L. made gun movements with his fingers, pretending to shoot at staff members when he was getting off of the bus.  N.L. also bit a teacher in the leg.

A new IEP was developed on January 24, 2003, noting significant concerns with N.L.'s physical aggression.  The IEP also noted that N.L. had suffered hearing loss in his right ear.  While N.L. had shown significant improvement in vocabulary skills and in answering simple questions, it was decided that N.L. needed to remain in an Early Childhood Special Education Program.  N.L. was moved to the Crestview school, where he attended through May 2004.  Progress reports show that N.L. fared well in the early childhood program at Crestview.  He was making sufficient progress in interacting with his peers and the records did not indicate any increased physical or verbal aggression.

### B.    Kindergarten: 2004-2005 School Year

An IEP for transition to kindergarten was developed on March 5, 2004.  The IEP goals addressed articulation, language, appropriate verbal interactions, pre-writing skills, visual motor skills and gross motor skills.  N.L. began kindergarten in August

---

[1]Reactive attachment disorder is a serious mental disorder in which infants and young children fail to establish healthy bonds with caregivers.  The lack of emotional support as an infant can hurt the child's ability to establish future relationships.  Symptoms include withdrawal, acting aggressively towards others, and not engaging in proper social interaction.  See http://www.mayoclinic.com /health/reactive-attachment-disorder (last viewed February 8, 2010).

2004 at Babler Elementary School in the Rockwood school district, where he attended half days in a regular education class with 450 minutes of resource services per week. Reports indicate that N.L. quickly resumed his aggressive behavior.

An IEP that was developed on October 14, 2004 noted that N.L. had an educational diagnosis of Young Child Developmental Disability affecting motor, communication, social and academic skills. The IEP increased N.L.'s special education services. An additional IEP was developed in December 2004, creating a behavior intervention plan for N.L. The IEP team believed that N.L. responded to directions that he did not clearly understand with noncompliant and aggressive behavior. The IEP changed N.L.'s placement from Babler Elementary to Eureka Elementary, due to his "regression in academic and behavioral functioning." The report indicated that N.L. still suffered from hearing loss in one ear, and that a hearing aid and preferential seating with his left ear toward the teacher was required.

N.L.'s kindergarten teacher at Eureka Elementary was Dianne Siebert. Ms. Siebert's classroom was a specialized room designed to address students with significant behavioral problems, providing a more structured environment for the students. N.L. received a hearing aid to use during class. At the end of the third quarter, Ms. Siebert wrote that she was pleased with N.L.'s behavioral progress. She described his behavior as "very manageable." Janet Booth, SSD's social worker, reported that N.L. "thrived" in the structured setting at Eureka.

On January 4, 2005, N.L. was seen by his treating psychiatrist, Dr. Michael Shanker. Dr. Shanker's report indicates that N.L. had attacked his sister and had bitten an older cousin. N.L.'s diagnosis was bipolar affective disorder type II, rule out Asperger's disorder versus reactive attachment disorder, and speech and motor delay.

A report dated March 10, 2005 from Dr. Dave Overstreet, a psychologist, agreed with much of Dr. Shanker's diagnoses.

Because plaintiff had been successful in Ms. Siebert's classroom, N.L. was moved to a cross-categorical self-contained classroom at Eureka, taught by Sandy Neuman.  N.L. attended the general education kindergarten class for one hour each day.  Plaintiff Jackie Lordo acknowledged that N.L.'s kindergarten year at Eureka was "pretty good" and agreed that N.L. had shown significant improvement.

### C.    First Grade: 2005-2006 School Year

In August 2005, N.L. began first grade at Ellisville Elementary School, a school closer to N.L.'s home.  The move was requested by plaintiff Jackie Lordo.  An August 10, 2005 IEP recommended placement outside of regular education for more than sixty percent of the school day.  While N.L. participated in some general education activities at Ellisville, he was able to remain in the general education setting for only approximately twenty minutes at a time.  On October 21, 2005, when N.L. was just over six and a half years old, he bit a staff member on the leg and punched her in the face.  Just ten days later, N.L. hit a teacher's assistant in the eye with a marker.  The assistant required medical treatment.  N.L. also bit a teacher's assistant on the hand three times, breaking through the skin.

N.L.'s aggressive behavior continued when, on December 2, 2005, he bit a teacher's assistant two times on the arms, breaking the skin both times.  He also punched his teacher in the nose and kicked a teacher assistant in the leg.  N.L. also kicked the special education area coordinator in the leg.  Five days later, N.L. bit another teacher's assistant on the arm and punched her in the face.  Additionally, N.L. was reported to be very aggressive with other students.  Other incidents included hitting, biting, and the use of inappropriate language.  N.L. was suspended four times.

Due to his aggressive behavior at Ellisville, N.L. was transferred on December 12, 2005 back to Ms. Siebert's classroom in Eureka, where he had experienced success as a kindergartner. N.L. finished his first grade year in Ms. Siebert's classroom doing very well behaviorally. Progress reports show that N.L. responded well to the structured environment, seemed happy, and was affectionate towards staff. His ability to recognize upper and lower case letters of the alphabet improved, as did his ability to copy letters, add numbers up to five and telling time. Plaintiff Jackie Lordo acknowledged that the portion of N.L.'s first grade year spent in Ms. Siebert's classroom at Eureka was a success.

### D. Second Grade: 2006-2007 School Year[2]

An IEP for the 2006-2007 school year was developed on June 8, 2006. Accommodations included preferential seating and required teachers to check with N.L. often to ensure understanding. N.L.'s behavioral goals included speaking in a respectful voice tone with appropriate words and initiating appropriate peer interaction.

N.L. began second grade in August 2006 in Ms. Siebert's self-contained class at Eureka Elementary. Plaintiff Jackie Lordo acknowledged that, initially, N.L. did well. However, as the first semester passed, the intensity and frequency of behavioral outbursts by N.L. increased. At that point, there were six boys in the class, ranging from 7 to 12 years old, including some new students. The evidence indicates that the inappropriate behavior of the class as a whole escalated, resulting in several suspensions. The students in the class became known as the "six-pack" because of their difficult behavior.

---

[2]The panel found that N.L. did not receive FAPE from SSD beginning sometime around Thanksgiving of 2006 and continuing through the remainder of the school year.

N.L. was becoming increasingly upset and would often come home crying.  N.L. did not feel safe in the class and was becoming more aggressive at home.  N.L's mother thought that the class was chaotic and out of control.  She requested a functional behavioral assessment and, together with several other parents, met with SSD personnel in a series of three monthly meetings beginning in October 2006.  Val Lyons, the mother of one of N.L.'s classmates, testified that the purpose of the meeting "was to address increased behaviors, students being bitten in class, very hostile environment, children sleeping during school, [and] just [the] gradual decline [and] down spiraling for all our children." (Tr. 436).[3]  SSD attempted to address the situation by adding an additional teacher assistant to the classroom and other staff changes.  An assessment of Ms. Siebert's classroom was made by other SSD personnel.

During this time, N.L. was participating in group therapy sessions with Jan Booth, an SSD social worker.  Ms. Booth testified that she was working twice a week in Ms. Siebert's classroom during N.L.'s second grade year.  Ms. Booth worked with Ms. Siebert to develop strategies to address the students' behavior, including N.L.'s behavior.[4]  Ms. Booth found N.L. to be "very good for most of the first semester." (Tr. 626).  Ms. Booth testified that, although she did not have significant behavior problems with N.L., she recognized that N.L. became more grandiose and would occasionally

---

[3]When the Court refers to the transcript of the administrative hearing, the Court will cite the reference as (Tr. ___).  References to plaintiffs' exhibits and defendant's exhibits will be identified as (P-___) and (D-___), respectively.

[4]When developing these strategies, Ms. Booth relied upon her discussion with Dr. Shanker in which she was informed that N.L. was diagnosed with bipolar disorder.  Ms. Booth was not made aware that Dr. Shanker had since changed N.L.'s diagnosis to reactive attachment disorder.  However, Ms. Booth testified that she did not believe that knowledge of a diagnosis of reactive attachment disorder would have changed the way she worked and interacted with N.L.

make outrageous statements. Ms. Booth felt that N.L.'s behavior problems increased sometime around November or December. Ms. Booth did not observe N.L. to have any hearing problems.

At home, N.L. was becoming increasingly hostile towards his parents and sister, verbally and physically abusing them. N.L. also began wetting his bed again and was experiencing night terrors. N.L.'s father testified that N.L. cried each night before bed.

In November 2006, N.L.'s parents employed Elizabeth Bates to provide speech therapy for N.L. outside of school. Ms. Bates testified that N.L. suffered from a speech and hearing impairment. She opined that N.L. could not hear sounds or words as well as other students. As a consequence, N.L. could not understand directions or expectations and would become frustrated because others could not understand him.

N.L.'s IEP team met on December 19, 2006. Ms. Siebert, Ms. Booth, and N.L.'s mother were each present, among other school personnel. The IEP report indicates that N.L. was achieving some progress on this goals, notably 67% success on speaking in a respectful tone of voice and 70% success in appropriate peer interaction. Areas of concern included "showing respect for authority, peer interaction and achievement in all academic areas, [and] fine and gross motor and speech and language issues." (D-130 at 1319). The report noted that N.L. has an "educational disability of emotional disturbance as well as a Language Impairment in Pragmatics, Syntax, Morphology, and a Speech Impairment in Sound System Disorder." (D-130 at 1318). N.L.'s mother indicated that she was concerned that N.L. was not being serviced under the correct diagnosis and requested that he be reevaluated.

Reevaluation was completed on January 26, 2007.[5]   As a result of the reevaluation, the team determined that N.L. continued to qualify for services with diagnoses of Emotional Disturbance and Speech Impaired - Sound System Disorder. The team removed the diagnosis of Language Impairment.

Academically, Ms. Siebert noted that N.L. was making some progress in several areas.  His latest report card indicated improvement in recognizing sight words, identifying sounds in words, answering basic comprehension questions, interpreting the calendar, and understanding basic addition and subtraction.

Medically, plaintiff was diagnosed by James Forsen, M.D., on January 12, 2007 with moderate to mild hearing loss in his right ear and a low frequency loss in his left ear.  Dr. Forsen recommended that the IEP team discuss an "FM system" at the next team meeting.  On January 15, 2007, Dr. Shanker stated that N.L. was presenting a "diagnostic dilemma."  (D-137 at 1372).  Dr. Shanker opined that, while he debated whether a diagnosis of autism or bipolar disorder was appropriate, he felt the most accurate diagnosis for N.L. was Reactive Attachment Disorder.  Dr. Shanker recommended that N.L. be integrated into mainstream classes as much as possible "to help foster normal behavior he could learn from his peers."  (D-137 at 1372).

_____

[5]Reevaluation produced a Verbal Scale score of 86, a Non-Verbal Scale score of 77 and a Full Scale score of 80.  Other scale scores included 85 on Fluid Reasoning, 83 on Knowledge, 92 on Quantitative Reasoning, 79 on Visual-Spatial Processing, and 77 on working memory.  (Exhibit 141 at 1392).  The panel noted that these scores compared favorably with previous cognitive assessments.  N.L. received a composite score of 100 on Language Content, 91 on Language Structure and 97 on Core Language.  A behavior assessment scale was completed by two of N.L.'s teachers and by N.L.'s mother.  Ms. Siebert's scores produced nine ratings in the "clinically significant" range, including aggression and conduct problems, and 9 ratings in the "at risk" range.  (Exhibit 141 at 1395).  N.L.'s mother's evaluation produced no scores in the "clinically significant" range, and 9 ratings in the "at risk" range.

School reports indicate that N.L. was behaving aggressively and inappropriately during this time period. On December 20, 2006, an incident report indicates that N.L. pushed over a study carrel and jumped on top of it. N.L. subsequently pushed a second carrel over and ran out of the room yelling, "This is payback." N.L. was hitting, kicking and fighting while staff tried to restrain him. On January 17, 2007, N.L. hit a teacher with a stick, kicked and punched adults, and "kicked the principal in his private area." (D-138 at 1375). N.L. had to be restrained and was sent home with his mother. On January 30, 2007, N.L. came up behind an aide and placed his hands up her shirt and then down her back, resting his hands on the aide's buttocks in an attempt to pull her pants down. The aide reported that she felt sexually assaulted by the incident. Later that same day, N.L. licked an aide's breast through her sweater and attempted to lick other parts of her body. N.L. was suspended for several days.

An IEP was developed in a series of meetings beginning in late January and ending on February 6, 2007. The report indicates that N.L. was having behavioral outbursts one time a week on average. The IEP report noted that N.L. had made progress on some of his IEP goals, including behavioral goals. However, with respect to his behavior, the IEP noted that N.L. had recently had more incidents requiring intervention. The IEP did not make any revision to N.L.'s behavioral goals.

N.L.'s mother brought audiology reports to share with the team, and believed that N.L. should be utilizing an FM system. N.L. was seen by a school audiologist on February 6, 2007, and received a diagnosis of "hearing impaired, at least temporarily." (P-1 at 12). The IEP team noted that N.L. had previously worn hearing aides in both ears, but discontinued them as a result of chronic ear infections. The team decided that N.L. was to have preferential seating in all settings and that teachers should check often for understanding. The use of an appropriate FM system would be investigated.

N.L.'s mother also requested that N.L. be placed in a general education classroom with an assistant. She stated that she believed N.L. was overwhelmed by the change in routine and the personnel changes that had occurred in Ms. Siebert's room. The IEP team disagreed, and recommended placement in a private school facility. The decision was based on N.L.'s need for "a learning environment that offers more intensive therapeutic services to meet his emotional needs as evidenced by his verbal and physical aggression toward adults." (D-144 at 1473). The decision was made that N.L. be placed at Edgewood Children's Center.[6]   N.L.'s current placement of self-contained in a general education setting was considered, but was ultimately rejected due to the increase in N.L.'s aggressive behavior toward adults. Likewise, placement in a separate public day school was rejected due to N.L.'s aggressive behavior. As noted by the panel, no representative of any private school, including Edgewood, was invited to the IEP meeting or attended any of them.

The parents initially declined the assignment to Edgewood, and the February 6, 2007 IEP was amended on March 5, 2007 to provide homebound instruction based on medical reasons. Dr. Shanker testified that he had advised the parents to decline the Edgewood assignment and keep N.L. at home. Dr. Shanker stated that he "felt like the classroom was really problematic for him in particular." (Tr. 254). Dr. Shanker testified that he was surprised that N.L. was placed at Edgewood because there were "other schools within the system which the children [did not] have as extreme of behaviors" as those at Edgewood. (Tr. 261).

Homebound instruction started on March 8, 2007. On March 13, 2007, N.L.'s parents completed an application for admission to Promise Christian Academy

---

[6]The hearing panel found that the placement at Edgewood was inappropriate because it was not the least restrictive environment for N.L.

("Promise"). N.L.'s parents applied to other schools as well, but each one rejected N.L.'s application. On April 10, 2007, N.L. was conditionally accepted at Promise. The conditions for acceptance included a requirement that N.L. begin at Edgewood and stay enrolled there through the summer. Promise also indicated that placement would be reevaluated after any behavioral incident and that N.L. would be sent home if he assaulted a teacher or classmate.

N.L. had surgery on April 4, 2007, to reconstruct his right ear drum and to scrape out an ear infection. There was immediate and noticeable improvement in N.L.'s hearing ability.

N.L. began attending Edgewood as a day student on April 12, 2007, when he was eight years old.[7] His teacher was Susan Breight, a certified special education teacher. Each student at Edgewood receives two individual therapy sessions and three group therapy sessions per week. Generally speaking, Edgewood does not send children home for misbehaving. Instead, misbehaving students were sent to a separate, quiet room, located next to the classroom. Edgewood does not develop a behavior plan until the student has attended for at least one month, in order to allow Edgewood staff to better identify the primary issues a student would have in the classroom environment. Ms. Breight developed a behavior plan for N.L., although it was developed without any parental input and did not address any problems of sexualized conduct or aggressive behavior towards adults.

On April 26, 2007, N.L.'s parents indicated that they felt N.L.'s behavior was improving. On May 14, 2007, plaintiffs stated that N.L. was stable with "slow steady

---

[7]Students in Edgewood's classrooms are placed according to age. There are twelve separate classrooms, with each room having a maximum of ten students. The classrooms are housed in two separate buildings and are each staffed by a certified special education teacher, a teacher's assistant, and a licensed therapist. The children in N.L.'s classroom ranged from 7 to 9 years old.

progress." (Tr. 216). However, plaintiff Jackie Lordo indicated that N.L. was being bullied and did not have friends. According to N.L.'s mother, N.L. was becoming more aggressive at home and was having night terrors again.

N.L.'s report card indicated that progress was being made on six of the goals in the IEP. Ms. Breight noted that "[N.L.] works hard when given assistance." (D-168 at 1689). Ms. Breight noted that N.L. needed to continue to work on talking back and verbal aggression.

N.L.'s last day at Edgewood was on May 30, 2007. Ms. Breight testified that N.L. had negative behavioral problems at Edgewood on twenty-four separate days during the six weeks he was attending her class. However, the records do not indicate that N.L. acted aggressively or sexually towards adults. Ms. Breight also testified that N.L. was able to make friends at Edgewood.

Several people testified that they did not believe Edgewood was the proper placement for N.L. Dr. Shanker initially reported on May 12, 2007 that N.L. was responding well to the environment at Edgewood. However, at the hearing he testified that, after interviewing N.L., he became concerned that N.L. was "deteriorating at that time, really emulating a lot of the characteristics that he was seeing from the other kids." (Tr. 260). Dr. Shanker also testified that he was concerned that N.L. was going to continue to deteriorate if left at Edgewood and that he "didn't really want [N.L.] to continue there." (Tr. 260). Dr. Shanker shared his concerns with N.L.'s parents.

Franklin W. Copanas[8], a licensed counselor who had been working with N.L. since February 2007, testified that he visited N.L. at Edgewood and met N.L.'s teacher. Mr. Copanas testified that Edgewood staff told to him that N.L. was frequently defiant

_____

[8]The testimony of Mr. Copanas is incorrectly labeled in the transcript as the second testimony of Dr. Ralph Carrafa. (Tr. 372-73).

and angry, but that he was adjusting.  Mr. Copanas felt that Edgewood was a well-run program, but was unsure that it "was designed to work specifically with attachment related issues." [9] (Tr. 385).  Mr. Copanas testified that it was his "personal hope…that [N.L.] could be in a less restrictive environment [than Edgewood]."  (Tr. 385).  Mr. Copanas felt that N.L. would do better in environment where the children around him were behaving appropriately, as seeing the negative behaviors of his classmates at Edgewood merely reinforced his belief that it is appropriate to behave that way.  Mr. Copanas shared his concerns with N.L.'s parents.

Ms. Bates, N.L.'s speech therapist, testified that she noticed a negative difference in terms of N.L.'s receptiveness to therapy while he was attending Edgewood.  She testified that "I thought we were having an out of body experience, to be honest with you [and] he was not the same kid."  (Tr. 109).  She told N.L.'s mother that she was "very concerned about [N.L.'s] well-being."  (Tr. 110).

N.L. did not attend the extended school year services offered at Edgewood during the summer of 2007.  Instead, N.L. received homebound instruction from July 9, 2007 through August 2, 2007.  On July 17, 2007, N.L.'s parents gave notice to SSD of their intention to withdraw N.L. from public school and make a private placement at public expense.  N.L.'s parents investigated several private schools, but Promise continued to be the only school that would accept N.L.

E.    Third Grade: 2007-2008 School Year

---

[9]Mr. Copanas specialized in working with children with reactive attachment disorder.  He felt that Edgewood's point system, used to reward children for good behavior, was not structured for children with attachment disorders.  In his opinion, such a system is a poor choice for most children with attachment disorders, because they will often purposefully misbehave in order to lose points and "prove it to themselves that they are a bad person".  (Tr. 388).  If a point system is in place, Mr. Copanas believes that it should be executed without the child's knowledge.  N.L. knew how the point system operated at Edgewood.

N.L. entered third grade at Promise[10] on August 21, 2007, on a conditional basis. N.L.'s parents had been warned that N.L. might not be able to attend if his inappropriate language continued. N.L.'s teacher at Promise was a speech and language pathologist.

Promise developed an IEP in October 2007, noting that N.L.'s behavior often interfered with his ability to learn. The first listed intervention was "Prayer." (D-187 at 1903). A second intervention was identified as keeping N.L. in a small class with a low teacher-to-pupil ratio. The IEP noted that math was an area of strength for N.L., but reading was a concern. The report indicated that, if N.L. were to misbehave three times, he would be sent home.

N.L. had major behavioral problems, similar to those he had at Edgewood and Eureka, when he first started at Promise. N.L.'s parents often received calls from Promise to pick N.L. up from school. Those calls began to taper off sometime around November 2007. The IEP report indicates that N.L.'s behavior had become "less and less of an issue as he learns he is safe and is accepted in our classroom." (D-187 at 1904).

However, N.L.'s inappropriate language continued throughout his time at Promise. A memo dated November 28, 2007, indicated that N.L. was disobedient and frequently used curse words. The memo indicates that N.L. "wants to have a friend desperately." (D-188 at 1906). However, few classmates were willing to befriend N.L. because he bullied them.

In a February 11, 2008 note to Dr. Shanker, N.L.'s teacher at Promise, Kathy Bingley, wrote that N.L. was having difficulty with transitions, was cursing and needed

---

[10]Promise Academy is "a highly structured school with less than fifteen children; there is a low staff to student ratio, approximately 2 children per staff." (P-3 at 3). All of the students attending Promise had special education needs.

to be in control. On February 14, 2008, Ms. Bingley stated that N.L. was still misbehaving. Behavior concerns included: (1) N.L.'s inability to transition from one task to another; (2) N.L.'s inability to accept ownership of the poor choices he makes; (3) N.L. gets angry verbally and physically when he is not in control; (4) N.L. frequently uses inappropriate language; and (5) N.L. bullies his classmates. Ms. Bingley stated that, due to these concerns, N.L. would need to attend a different school for the rest of the year.

Despite the decision by Promise that N.L. should attend a different school, several witnesses testified that N.L. had improved both academically and behaviorally during his time at Promise. Ms. Bingley's final report indicated that, during the six months N.L. had attended Promise, there were academic improvements in decoding, handwriting and keyboarding. Behavioral improvements were noted in accepting consequences, serving his time out, listening to reasoning and being willing to apologize. Dr. Shanker testified that N.L.'s overall demeanor was improved and that the frequency of his aggressive outbursts had declined. Dr. Shanker attributed some of this improvement to N.L.'s educational setting at Promise. Ms. Bates described the change in N.L. as "180 degrees," in that N.L. was anxious to please his teachers and eager to make friends with other students. Dr. Ralph Carrafa, a licensed psychologist, observed N.L. at Promise and testified that he saw some "rather remarkable changes in the very short time that [N.L. was at Promise]." (Tr. 308-09). Dr. Carrafa noted that N.L.'s aggression had "diminished significantly," although he was considered the most problematic student at Promise. (Tr. 309, P-3 at 3). He attributed that to the staff at Promise, noting that "[t]hey were the most tolerant people you're ever going to find." (Tr. 309). He noted, however, that ultimately Promise could not accept N.L.'s consistent use of inappropriate language. No one from Promise testified at the

hearing, and there was no evidence that the education program at Promise included a therapeutic element. N.L.'s parents incurred tuition expenses in the amount of $6,026.67 at Promise.

On February 26, 2008, N.L. began school at Annunziata. An IEP was developed in April by the Archdiocese of St. Louis Department of Special Education. Short-term objectives included treating others with respect, using appropriate language, accepting adult direction without argument, staying on task and keeping hands and feet to self. N.L. attended school at Annunziata for fifty-four days. He received final grades of B in math, C in reading, B in language, A in spelling, B in religion, B in science, B in social studies, C in art, and A's in music and physical education.

Dr. Carrafa visited Annunziata on one occasion and observed N.L. in his classroom. There were approximately ten students in the class, plus one teacher and one aide. This was approximately twice the size of N.L.'s class at Promise. Dr. Carrafa indicated that N.L. had many of the same problems at Annunziata that he had when he started at Promise, including aggressiveness, difficulty attaching to staff, inappropriate language and threatening behaviors. Dr. Carrafa noted that N.L. was beginning to make some strides towards compliance towards the end of the school year, but he was the most difficult student at Annunziata. Mr. Copanas noted that N.L. was more cooperative in his classroom at Annunziata than he had been at Edgewood. However, Mr. Copanas's notes also indicate that Annunziata staff reported N.L. to be defiant, non-compliant and threatening. Ms. Bates testified that N.L.'s behavior escalated when he began attending Annunziata. No one from Annunziata testified and there is no evidence that the educational setting at Annunziata included a therapeutic element. N.L.'s parents incurred $2,333.32 in tuition expenses from Annunziata.

### III. Legal Standard

In reviewing a final determination of a state administrative panel's resolution of an IDEA claim, a "district court must take into consideration not only the records of the administrative proceedings, but also any additional evidence submitted by the parties." Blackmon ex rel. Blackmon v. Sprinfield R-XII School Dist., 198 F.3d 648, 654 (8th Cir. 1999). The court is required to "make an independent determination of the issues based on a preponderance of the evidence." Id. However, because the administrative panel had the opportunity to observe the demeanor of witnesses at the hearing, the court must give "due weight" to the outcome of the administrative proceedings. Strawn v. Missouri State Bd. of Educ., 210 F.3d 954, 958 (8th Cir. 2000). The party challenging the outcome of the administrative hearing panel's decision on any issue bears the burden of proof on that issue. Blackmon ex rel. Blackmon, 198 F.3d at 658.

## IV.   Discussion

Each party is challenging different portions of the panel's decision. In their complaint, plaintiffs challenge the panel's denial of tuition reimbursement for their placement of N.L. at Promise and Annunziata. Plaintiffs also ask that the Court remand this matter to the panel for the purpose of ordering future placement for N.L. In its counterclaim, SSD contends that the panel erred in concluding that SSD did not provide N.L. a FAPE beginning in November 2006. SSD also claims that the panel incorrectly found that a separate private school placement at Edgewood, as recommended in the February 2007 IEP, was not the least restrictive environment for N.L. Finally, SSD challenges the panel's decision to award compensatory services to N.L.

### Free Appropriate Public Education

The Court first turns to the panel's finding that SSD failed to provide N.L. a free appropriate public education beginning in November 2006, when N.L. was in second

grade at Eureka.  Under the IDEA, children with disabilities are entitled to a FAPE.  See 20 U.S.C. § 1412.  "A specialized course of instruction must be developed for each disabled student, taking into account that child's capabilities."  Missouri Dept. of Elementary and Secondary Educ. v. Springfield R-12 School Dist., 358 F.3d 992, 998-99 (8th Cir. 2004).  "The services that a school district provides to a child are to be summarized in a written individualized education program ('IEP')."  Id. at 999.  In order to be "appropriate," the IEP must be "reasonably calculated to provide some educational benefit" to the student.  Board of Education v. Rowley, 458 U.S. 176, 102 S. Ct. 3034 (1982).

The panel found that N.L. stopped receiving a meaningful education sometime around Thanksgiving of 2006.  At that time, N.L. was in Ms. Siebert's classroom at Eureka.  The panel found that "[N.L.'s] classroom became almost non-functional" around that time.  The evidence supports the conclusion that the inappropriate behavior of the children in Ms. Siebert's classroom at that time was escalating dramatically.  Because of their combined aggressive behavior, the six students in Ms. Siebert's classroom at that time were known as the "six-pack."  The parent of another student in the class testified TO the downward spiraling of the students' behavior.  SSD admits, in its response in opposition to plaintiffs' motion, that Ms. Siebert's classroom was not functioning well in late fall of 2006.  SSD attempted to rectify the situation by making staff changes in the classroom, but N.L.'s behavior continued to deteriorate.

The Court concludes that the preponderance of the evidence supports the administrative panel's finding that N.L. did not receive FAPE from SSD while he was in Ms. Siebert's classroom at Eureka beginning in November 2006.  One of the primary educational goals for N.L. was controlling his aggressive behavior, which haD

interfered with his ability to learn since he was as young as sixteen months. This goal was clearly not met through his continued enrollment at Eureka subsequent to November 2006. Indeed, the evidence supports the conclusion that N.L.'s aggressive and inappropriate behavior increased dramatically during this time period. Reports indicate that N.L. pushed over study carrels, hit and kicked staff members, fought staff members who tried to restrain him and sexually assaulted two female aides. The February 6, 2007 IEP noted that N.L. was having behavioral outbursts at least once a week. Dr. Shanker stated on several occasions that N.L. would benefit most from a learning environment where he was surrounded by peers exhibiting positive behaviors. The continued placement of N.L. in Ms. Siebert's classroom, where the behavior of the "six pack" was becoming increasingly extreme, certainly did not fit this description. The chaotic environment in N.L.'s classroom at that time, as described by several witnesses, was not "reasonably calculated to provide some educational benefit" to N.L.[11] The record supports the panel's decision in that regard.

## Least Restrictive Environment

The Court next turns to whether the February 6, 2007 IEP placement at Edgewood was appropriate. Under the IDEA, children with disabilities are to be educated with children who are not disabled "to the maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(B). Children should be placed in "special classes [or] separate schooling...only when the nature or severity of the disability is such that education in

---

[11]There is evidence indicating that N.L. made slight academic progress while in Ms. Siebert's classroom, which is an "important factor" in ascertaining whether the school district provided FAPE. See CJN v. Minneapolis Public Schools, 323 F.3d 630, 642 (8th Cir. 2003). However, based on the record in this case, the Court believes that the panel could properly find that "any slight benefit obtained was lost due to behavior problems that went unchecked and interfered with his ability to obtain a benefit from his education." See Neosho R-V School Dist. v. Clark, 315 F.3d 1022, 1029 (8th Cir. 2003).

regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." Id. "This requirement is known as 'mainstreaming' or the 'least restrictive environment.'" Carl D. v. Special School Dist., 21 F.Supp.2d 1042, 1058 (E.D. Mo. 1998). However, "[w]hile the IDEA evidences a strong congressional preference for mainstreaming, this preference is not absolute." A.W. by and Through N.W. v. Northwest R-1 School Dist., 813 F.2d 158, 162-63 (8th Cir. 1987). In determining whether private placement is appropriate, "the court should determine whether the services which make the placement superior could be feasibly provided in a non-segregated setting." Id. at 163. If so, then the private placement was inappropriate under the IDEA. Id.

The panel found that Edgewood was not an appropriate placement, concluding that it did not provide the least restrictive environment for N.L. The majority of the panel's discussion on this issue surrounds the failure of N.L.'s IEP team to include a representative of Edgewood, or another private school, as required under 34 C.F.R. § 300.325(a)(2). The panel found that the absence of a private school representative prevented the IEP team from fully evaluating N.L.'s placement needs. Noting that plaintiffs did not allege this procedural violation in the due process complaint, the panel found that it could not be raised at the hearing or considered by the panel. Nevertheless, the panel still found that Edgewood was not the least restrictive environment. SSD argues that the panel's decision was improperly influenced by this procedural violation, and contends that the decision is not supported by the preponderance of the evidence.

First, the Court agrees that it would be inappropriate for the panel, or this Court, to consider claims that plaintiffs failed to raise in the due process complaint. See 20 U.S.C. § 1415(i)(2)(A). The panel acknowledged that it was prohibited from

considering any procedural error in developing the February 6, 2007 IEP, because plaintiffs did not make an allegation of such error in their due process complaint. However, out of the five pages the panel dedicated to discussing the least restrictive environment issue, all but one paragraph focuses primarily on this procedural error. (See Panel Decision at 50-55). Nevertheless, the panel concluded that "whatever the procedure used to place [N.L.] at Edgewood, such placement was not appropriate as Edgewood was not the least restrictive environment for [N.L.]. (See Panel Decision at 55). The panel continued, noting that "[N.L.'s] successes and failures at Edgewood are hotly contested; however, given [N.L.'s] prior successes in less restrictive environments, Edgewood was not the least restrictive environment for [N.L.]. (See Panel Decision at 55).

Although it appears that the panel was improperly influenced by the procedural violation, the Court still concludes that the preponderance of the evidence supports the finding that the private school placement at Edgewood was not the least restrictive environment for N.L. as of February 6, 2007. In deciding that a private separate day school facility was the appropriate placement for N.L., the February 6, 2007 IEP noted that "[N.L.] requires a learning environment that offers more intensive therapeutic services to meet his emotional needs as evidenced by his verbal and physical aggression toward adults." (D-144 at 1473). The IEP team considered multiple placements prior to deciding that N.L. required placement in a private separate school. Each of these placements was rejected on the basis of N.L.'s verbal and physical aggression towards adults in school settings.

Although N.L.'s verbal and physical aggression toward adults increased dramatically toward the end of his enrollment at Eureka, is it not clear that the private school placement at Edgewood was the least restrictive environment for controlling

such behavior.   First, as noted by the panel, N.L. exhibited behavioral success in less restrictive environments in the past, including his first grade year and most of the first semester of his second grade year at Eureka.  Thus, evidence supports the conclusion that the behavioral reason cited by the IEP team for placing N.L. at Edgewood could be addressed equally as well in a less restrictive setting.

In addition, several witnesses agreed that Edgewood was an inappropriate placement for a student with N.L.'s individual needs.  Dr. Shanker shared his concerns with N.L.'s parents, prompting them to initially decline the assignment to Edgewood. Dr. Shanker felt that N.L. would better benefit behaviorally from a more mainstream environment, where N.L. could observe appropriate behavior from his peers.  Mr. Copanas, N.L.'s counselor, did not feel that Edgewood was designed to meet the needs of children with attachment disorders, like N.L.  Mr. Copanas also indicated that N.L.'s behavior would benefit from a less restrictive environment than Edgewood.  N.L.'s speech therapist, Ms. Bates, testified that N.L. was not receptive to therapy at Edgewood and told N.L.'s mother that she was very concerned about N.L.'s well being.

Based on all of the above, the Court concludes that the preponderance of the evidence supports the panel's finding that the February 6, 2007 IEP's placement was inappropriate because Edgewood was not the least restrictive environment for N.L. Although the panel may have improperly considered the procedural violation that had been waived by plaintiffs, any such error was harmless because the evidence (without consideration of any procedural error) still supports the ultimate conclusion of the panel.

## Compensatory Services & Tuition Reimbursement

The final two issues[12] before the Court involve the relief awarded to N.L.  The panel ordered compensatory educational services, but denied plaintiffs' request for tuition reimbursement.  The panel did not order a future public school placement for N.L.

SSD claims that the panel improperly awarded compensatory services to N.L. An order of compensatory educational services "is appropriate relief under the IDEA for the denial of a FAPE because such relief is necessary to secure the child's right to a FAPE." Reese ex rel. Reese v. Board of Education, 225 F.Supp.2d 1149, 1164 (E.D. Mo. 2002).

The Court concludes that, because SSD failed to provide N.L. with a FAPE, an order of compensatory educational services is appropriate.  The panel ordered an award of one semester of services, representing the Spring 2007 semester when N.L. was denied FAPE in the least restrictive environment.[13]  The Court finds this award to be appropriate.  Indeed, the panel's award of one semester of services is less than that urged by Dr. Carrafa, who testified that N.L. might need two full years of additional service in order to compensate for the failed placements at Eureka and Edgewood. The Court concludes that the award of one semester of compensatory educational services, as outlined in the panel's decision, is an appropriate remedy in this matter.

---

[12]One additional issue alluded to by the parties concerns plaintiffs' allegation that SSD did not appropriately address N.L.'s hearing difficulties.  This issue was not briefed by the parties at great length.  To the extent that plaintiffs are making an additional claim related to N.L.'s hearing disability, the claim is denied.  The evidence does not support a finding that SSD ignored or failed to address any hearing difficulties of N.L.

[13]Although N.L. is not entitled to compensatory services for the three week period when he was homebound in the Spring 2007 semester, the panel found that this period was offset by the final three weeks of the Fall 2006 semester, where N.L. failed to receive FAPE at Eureka.  Thus, the panel concluded that an award of compensatory services for one full semester was appropriate.

Plaintiffs' contend that the panel should have also awarded tuition reimbursement for the independent placement of N.L. at Promise and Annunziata. The panel found that these placements were not appropriate and denied tuition reimbursement. SSD argues that, not only were these placements inappropriate, but tuition reimbursement for a parochial school placement violates the Missouri Constitution. The Court need not address SSD's constitutional claim, because it concludes that the panel correctly held that plaintiffs did not meet their burden of proving that Promise and Annunziata were appropriate placements for N.L.

When parents unilaterally place their child in a private school, they do so "at their own financial risk." Burlington v. Department of Education, 471 U.S. 359, 373-74 (1985). Tuition reimbursement is available "only if public school placement violated the IDEA and placement at [the private school] was proper under the Act." Independent School Dist. No. 283 v. S.D. by J.D., 88 F.3d 556, 561 (8th Cir. 1996). To receive tuition reimbursement, parents of a disabled child have the burden of showing that the private placement was necessary in order for their child to receive an appropriate education. See Reese ex rel. Reese, 225 F.Supp.2d at 1159.

Plaintiffs failed to submit sufficient proof for their claim that the placements at Promise and Annunziata were appropriate. No one from Promise or Annunziata testified at the hearing, and there was no evidence that either school program included a therapeutic element. As the panel pointed out, the fact that N.L. was expelled from Promise strongly suggests that it was not an appropriate placement.[14] Further, N.L.'s

---

[14]Plaintiffs contend that N.L. was expelled from Promise solely because of his foul language. However, Mr. Bingley, N.L.'s teacher at Promise, also pointed to additional behaviorial concerns as reasons for N.L.'s expulsion, including bullying classmates and N.L.'s tendency to become verbally and physically angry.

parents indicated that they were concerned N.L. would also be expelled from Annunziata due to his behavior.

While plaintiffs presented testimony at the hearing indicating that N.L.'s behavior improved[15] at Promise, other evidence supported the panel's conclusion that N.L.'s behavior problems remained significant.  Because the panel members had the opportunity to observe the testimony of each of these witnesses, the Court gives "due weight" to its conclusion that N.L. exhibited significant behavior problems---similar to those exhibited at Eureka and Edgewood---while attending Promise.

Further, there is little evidence to suggest that either Promise or Annunziata provided a less restrictive environment for N.L. than Edgewood.  In support of their argument that Edgewood was an improper placement, plaintiffs claimed that a separate private day school placement was not the least restrictive environment for N.L.  However, both Promise and Annunziata are both separate private day schools, belonging to the same placement category as Edgewood.  It is difficult to conclude that a separate private day school is both an improper placement (Edgewood) and a proper placement (Promise/Annunziata) at the same time.

Plaintiffs simply did not meet their burden of showing that Promise and/or Annunziata were appropriate placements for N.L.   Plaintiffs request for tuition reimbursement is denied.

---

[15]Even assuming that N.L.'s behavior did improve, that alone is not sufficient to show that Promise was an appropriate placement.  "Parents who choose a private school for their child which only offers a restrictive non-mainstream environment have the burden of proving that such an environment *is needed* to provide their child with an appropriate education."  Reese ex el Reese, 225 F.Supp.2d at 1159 (emphasis added).  Thus, plaintiffs must show that placement at Promise was necessary because it provided educational services that a public school system was unable to provide.  As the panel found, plaintiffs did not meet this burden.

Finally, plaintiffs contend that the panel erred by not ordering future public school placement for N.L. Plaintiffs request that the Court remand this matter so that the panel can determine a placement for N.L. The Court does not believe that the panel had an obligation to order a public school placement for N.L. Given that N.L.'s parents withdrew N.L. from public school, it is not apparent that they would have even accepted such a placement decision by the panel. In the event that N.L.'s parents wish for him to attend public school again, they can initiate the process by which an IEP will be developed for him and an appropriate placement decision will be made. Remand to the administrative panel is unnecessary to accomplish this goal.

### V. Conclusion

The Court affirms the decision of the administrative panel in its entirety. SSD failed to provide FAPE in the least restrictive environment beginning in November 2006 at Eureka and continuing through N.L.'s enrollment at Edgewood in the Spring 2007 semester. An award of compensatory services for one semester is appropriate. Finally, because plaintiffs failed to meet their burden of proving that Promise and Annunziata were appropriate placements for N.L., their request for tuition reimbursement is denied.

Accordingly,

**IT IS HEREBY ORDERED** that the motion [#22] of defendant Special School District of St. Louis County for judgment on the administrative record is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that the motion [#25] of plaintiff N.L., by and through his parents James and Jackie Lordo, for judgment on the administrative record is **granted in part and denied in part**.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of March, 2010.